May it please the Court, Maria Stratton, appearing on behalf of Appellant Bibiana Benson. I want to thank the Court for changing the order of the oral argument from Tuesday to today. Should we further sit on this case, awaiting Fan Fan and Booker? Well, I was a little surprised to be here today. But it's always nice to see you. It's always nice to see you, too, and it's always fun for me to run my mouth, so if you really want to hear me, I'm happy to do it. But aside from all that, you do agree we should wait for it? I mean, we're happy to hear what you have to say on the underlying merits, just in case the guidelines survive. But, I mean, basically you agree that we should sit on it? I do, Your Honor. Okay. My only concern is... How long is the sentence that's untainted by Blakely? One more month. One more month? If she were to get the sentence that she agreed to, didn't object to, which would be a 33-month low-end, I think 46 high-end sentence, she has now done 32 months. Originally, the parties were recommending to the court a low-end sentence. 33 or 37? 37 months is the low-end. So originally the parties were agreeing to a low-end sentence of 37, and probation had recommended a sentence, a low-end sentence of 37. My understanding of our Castro case is that if the sentence is imminently to be over as to the part which is non-tainted, that we're supposed to remand and let the district court do what it wants. Is that right? That's my understanding as well, Your Honor. You said one more month? Are you talking sometime in January? Five more months. 37 months would be the low-end. Five more months? She's done 32. She's got five to go on the untainted portion. She's got five to go on the untainted portion. Okay. Well, maybe the Supreme Court will hear from them in the next... From your lips to God's ear. Your Honor, I can proceed with my argument, or I'm happy to submit it, since it does appear that Booker and Fanfan will... I'm interested in what was decided that could cause an upward departure. Is there anything that could cause the upward departure that wasn't judge-decided but was led to? Not from my review of the record, Your Honor. She admitted to very little, actually, at her guilty plea, and even in her statement to the agents, if the court were to say that a statement to the agents counts as an admission for sentencing purposes, there was little, by way of factual admissions, that could be used to justify that departure. And the PSR outlined the extensive nature of the scheme, including the fact that there were 89 individual victims whose loss would not have been accounted for on the institutional loss. Well, no, the 89 victims, as I understand it, were the 89 people who were encapsulated in the 23 institutions. Sure. But their loss, their personal privacy interest loss, and having their identity stolen, would be different from the loss incurred for the financial institutions. If there was proof that there was non-pecuniary loss. There was an injection to the PSR, and obviously these folks, they were tied up with the institutions, so they obviously had a problem. I mean, it's just obvious. Well, Your Honor, those 89 people definitely had a pecuniary loss. No question about it. They were the ones whose banks, 23 banks, reimbursed them for the loss. So they were the ones who made up the $935,000 loss that the banks actually covered. Right. But they must have, I mean, just obviously had hassle. That's an assumption, isn't it? And it's an assumption that the district court certainly made. It's pretty inherent in the nature of the animal. Well, they had a hassle. I'll accept that because I have been a victim of identity theft myself. They had a hassle. But then the question is, well, is that hassle, whatever it was, and we don't know what it was because it wasn't laid out, is that hassle something that can be used as an upward departure, as a basis for an upward departure? Why isn't it an encouraged basis for departure under, I can't remember the name, but under the application note? Well, Your Honor, it's not. For individuals whose privacy is invaded. Well, what the application note says, which is application note 15, I believe, to Guideline 2B1.1, talks about what are encouraged upward departure considerations. And one of them is substantial harm to the victim's reputation or credit record. Substantial harm. Well, it's not just hassle. It's an invasion of their privacy interests. Well, I guess then the question would be, this court was going to have to determine what constitutes substantial harm on this record. And we don't have anything other than two individuals of the 89 who stated that they incurred endless hours of work. I don't know what endless means. It means one thing or another. There were no opposite proof or any, there was no evidentiary showing of any sort. The only evidentiary showing were two letters from two victims who stated that they put in endless hours to make sure that their credit ratings weren't damaged. I gather whichever agents were involved in the investigation here, they could probably produce some of the individuals at the hearings, is that right? Possibly. I would assume they probably could. And that would be something that evidence at the district court, I imagine, would want to take if it were sent back down to the district court. But countless phone calls. I was on the phone all day. Certainly it sounds like hassle, but I don't know that it satisfies the definition. Well, I would say it doesn't satisfy the definition. It doesn't invade privacy? Well, invasion of privacy isn't one of these four factors. It's substantial harm, substantial inconvenience to repairing the reputation. The victim was erroneously arrested or denied a job because of an erroneous arrest record. And the defendant totally assumed the victim's identity. Those are the four areas. Now, granted, the application note says that these are ñ this isn't a total list. But those are the four that are listed for when identity theft is the basis of the fraud. It resulted in a substantial invasion of a privacy interest through, for example, the theft of personal information, such as financial records. Well, Your Honor, there is a separate two-level departure, or upward adjustment that applies when identity theft is the basis for the fraud. And Ms. Benson got that. And that, when the identity theft 2F guidelines were molded into the 2B fraud guidelines, the overall goal was to use pecuniary loss as the measure of someone's punishment, severity of someone's punishment. But to take care of the problems, these inchoate problems that come with identity theft, the hassle, invasion of privacy, whatever, they added this two-level upward adjustment which Ms. Benson got for the fact that she was involved in identity theft. So for the district court now to come back and say, well, two letters that say endless hours of phone calls and all day on the phone and whatever, constitutes a substantial invasion of privacy, I submit to the court, isn't supported by the evidence. Okay. Why don't we hear from Mr. Rowley. The same question, you know, what about Fanfan and Booker? Just addressing Judge Fletcher's question about Castro, I mean, it does appear that there's at least one enhancement, at least one enhancement that is fully supported by the defendant's factual basis after her guilty plea. And I believe the defense noted this itself in footnote four of the supplemental Blakely brief. And that's the breeding enhancement, the enhancement for the unauthorized use or transfer of a means of identification unlawfully to obtain or produce another means of identification. That enhancement is supported by what she admitted in her guilty plea. That would raise her offense level by itself to offense level 12. If you subtract two for acceptance, then you're at offense level, apart from the departure now, you're at offense level 10. And with her criminal history category of one, if the court does conclude that the departure isn't supported by the facts that were adduced at sentencing, would be six to 12 months, I believe. That's based on the breeding enhancement. So I think that we are in Castro land. I think that that's pretty close to. Right now? Right. Today? Well, if that's the offense level, it would be. And if the offense level is, because I believe Castro, it focuses on the enhancements that are unaffected by Blakely. And so the real question here is, you know, is the loss enhancement fully supported by what she admitted at her guilty plea? And loss was contested at sentencing, but she did object to loss. She didn't object, as Judge Reimer pointed out, to significant portions of the PSR, but I think it's fair to say that she did object to loss. And that's a 14-level upward adjustment. Right. So what should we do now? The court could take one of two approaches. Even on the stipulated sentence, the sentence that the parties agreed to below, this is before Blakely, there's five months left, and the government has taken the position that we could reasonably expect Booker and Fanfan to come down in that period. On the other hand, we've been waiting for quite a while, and I was checking my web log on Tuesday, and the decision didn't come down. So it's sort of unclear, but there are five months remaining on the sentence that the parties agreed to below. And then if you applied a Castro analysis and concluded that the loss enhancement and the upward departure were not supported adequately by the facts adduced at sentencing, then you would be at offense level 10. I think that's the analysis. It is worth noting, though, as Your Honor pointed out, that there were large portions of the PSY that were not objected to, including the number of identities that were stolen by the defendant, and that number was 7 to 10,000. It's really important to distinguish between two categories of individual victims in this case. First are the individual fraud victims, the 89 people that Your Honor referred to. Those are the people whose identities were stolen by the defendant and who subsequently suffered actual fraud. They had fraudulent credit cards open in their names. They had bank accounts that were fraudulent and also created in their names. But in addition to that, there were between 7 and 10,000 people who had their personal information stolen but for whom the government didn't have evidence of actual fraud. And I think that's what the Court was focusing on. It included both categories, I believe. What kind of personal information? It was Social Security numbers, driver's licenses, dates of birth, that sort of thing. The defendant got that information from Choice Point, which is a large database of personal information. And from the record, I gather that what you would do is take that information and then in a lot of instances pull up credit reports, which would contain yet more information about the victim's credit histories. I believe the PSR said that she pulled down about 1,000 such reports. Excuse me, Your Honor? 1,000 credit history reports? That's right, Your Honor. And I believe she pulled those down from Advantage, which is a separate credit reporting agency. So you've got those two categories of victims. Now, the breeding enhancement, that is the enhancement for the use of an unauthorized use of a means of identification, that enhancement does address the fraud victims, the people who actually had fraudulent accounts open in their names. If you look at the background notes, it states clearly that the enhancement was intended to account for the non-monetary harms associated with these types of offenses, inconvenience, dislocation, that sort of thing. But the enhancement doesn't address the identity theft victims, that is the people who had their personal information taken and who suffered that invasion of privacy but who didn't actually suffer fraud. That factor is addressed in Note 15A, subcategory 2, which states that an upward departure may be appropriate if the offense resulted in a substantial invasion of privacy, which is precisely what you have when somebody steals your identity. I'd also note that in that same subcategory, I believe it's subcategory 2, it states that an upward departure may be appropriate if the offense risked substantial non-monetary harm. And again, when you have this many identity theft victims, 7,000 to 10,000, each of whom is put at risk of having fraudulent accounts open in their names, I think it's quite clear that there is a risk and a substantial risk of non-monetary harm. So that was the focus of the district court's departure ruling. It did include as a second factor, I think it's the second factor that the court referred to, the other group of victims, the people who called in and reported that they had fraud. That was the group of victims that the government used to calculate the loss in this case. But it's the identity theft victims that really drove the departure and their harms and the risk that they were taking.  Yeah, but many of these victims weren't aware that their personal information had been acquired by her. I think that's right. I think that's right. They would have only been made aware probably if they suffered fraud as a result. I mean, it's worth noting that the government wasn't able to investigate all of the queries that the defendant made and cross-referenced them to see if they were corresponding fraudulent accounts. The Experian database that lists the fraudulent accounts is organized by social security number. And so the government used only the queries that the defendant made by social security number, which numbered about 2,000, I think, of the 7,000 to 10,000. That was a category of victims that the government asked Experian to cross-reference with its database of fraudulent accounts. So as the district court noted, the loss enhancement probably understates the loss. And it was important to address the identity theft victims, and that's why the court departed upward. Just to return quickly to the Castro question, as far as the facts that would support the upward adjustment, again, the defendant didn't object to the PSR. And for that reason, the government didn't end up submitting – did the government initially ask for an upward departure? It didn't. The government took the position initially because of Note 3A, which defines victims in terms of actual loss, that the proper upward adjustment was to, under Section B2, but didn't seek an upward departure. It was the court that initiated the upward departure. That's right, Your Honor.  Yes, Your Honor. What happened is when there was argument on whether the enhancement for number of victims under B2, whether that could be construed to embrace these other individual victims, and when it became clear, because I think the notes make it clear, that it didn't embrace those victims, that's when the court expressed concern. But the government didn't see it that way at first. The government didn't. I believe that the trial AUSA stated that he didn't do research on an upward departure. I think the government was focusing on whether the victims could be counted in the upward adjustment for number of victims under B2. But Your Honor's right. I mean, the government wasn't seeking an upward departure at first. Thank you. Your Honor, what really brought us here was the district court's use of these 10,000 queries, where there was no evidence that, except for the 89, that there was no evidence that these people even knew their information had been queried. Does that make a difference? Well, I think it makes a difference when you're talking about harm, because the fraud guideline very clearly uses pecuniary harm as the touchstone for deciding the severity of a punishment. And when it comes to identity theft, because of all the problems that a court will have in drawing these types of bright lines about what is enough non-pecuniary harm, what even constitutes non-pecuniary harm, they have set out a separate upward adjustment when identity theft is involved. What we're talking about here is we all have information out there in cyberspace, whether we have put it out there voluntarily or whether it has been put out for us involuntarily by credit unions or credit agencies or whatever. For a court to say, well, just because you have queried someone's information out there, legally or illegally, that in and of itself is a substantial violation of privacy, really rubs the wrong way against the way the U.S. Sentencing Commission has decided to measure loss. And so I would suggest to the court that if the court, that the court not go down that road and tell the district court, yes, it's okay to use stand-alone queries without any other evidence of any other type of harm to increase a sentence, that would be a bad road to go down because it would be at odds with the way the fraud guidelines are written. What the judge was saying to us is that this kind of conduct is out of the heartland, so I'm just going to have to think about the conduct of this individual, not really the necessary known results on the individuals. To go out and query 10,000 is kind of out of the heartland, isn't it? Your Honor, I guess you could, I don't know if it's out of the heartland because these identity theft cases are new and the facts are just developing. When you think of someone, let's assume she did 10,000. Now, she said she queried 7 to 10, and there's really no information about what querying really means. No one seemed to press her on it, even in her written statement to the agents. Let's take the high end, 10,000 queries to choice point, and what we have are 89 people. To me, that could be pretty pathetic as well. As we use the example in our brief, let's say a bank robber goes out and cases 10 banks, drives around a community and looks at all the banks, and ends up choosing one bank to rob. Are we going to punish him because he cased 50 and he ended up robbing one? No, generally you punish him for what he did, which is he chose that one bank to rob. She queries 10,000 out there in cyberspace. My office queries those choice point accounts all the time. What do they learn when they make that query, do we know? These are public databases that you subscribe to, and you learn whatever that particular database has happened to gather on the individuals. So it could be address information, employment information, depending on what kind of subscription you have, past employment information, current employment information, home information, social security numbers, date of birth, sometimes credit histories. It really depends on how much information is floating out there about a particular person, which may explain why 10,000 inquiries were done. Do you have to have any type of qualification to subscribe or get to that information? I don't know that, Your Honor, and it's not in the record. I'm just asking this out of curiosity, really. I don't think I even want to know the answer. I know we have an account and our investigators use it, but I don't know what you need to do to get that information. Yeah, probably. All right, thank you. Thank you, Your Honor. Thank you, Mr. Rowley, for your argument. The matter just argued will be submitted. We'll hear next.
judges: B. Fletcher, Rymer, Paez